E.M. BABINEC d/b/a Stephens Park
Apartments, Appellant,

v.

Toyoshi YABUKI and Hiroko W.
Yabuki, Appellees.

No. S–3153.

Supreme Court of Alaska.

Oct. 19, 1990.

Rehearing Denied Nov. 15, 1990.

Kenneth P. Jacobus, Joe M. Huddleston, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Patrick M. Rodey, Ronald A. Offret, Aglietti, Rodey & Offret, Anchorage, Richard D. Pennington, Richard D. Pennington & Associates, P.C., Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

On March 30, 1984, Hiroko Yabuki suffered injuries to her lower back and legs when a step in the stairway to her apartment collapsed. In the lawsuit which she and her husband brought against the owner of the building, E.M. Babinec, the jury awarded her $550,000 and her husband $50,000. Babinec made a timely motion for a new trial and remittitur and subsequently made two motions for relief from judgment under Civil Rule 60(b)(2) and (3). These motions were denied. Babinec appeals, raising six main issues. We address each in turn.

### 1. The bicycle accident.

Babinec's motion for new trial was based on a claim of newly discovered evidence, namely that Babinec had discovered after the trial that Mrs. Yabuki had been struck by a bicycle about three weeks before the trial. Babinec argues that the recent accident was relevant because it

would serve as an explanation for Mrs. Yabuki's appearance before the jury, which "while walking around the courtroom, had to be that of a woman in severe pain." Babinec further contends that nondisclosure of this accident violated Mrs. Yabuki's duty to supplement discovery responses under Civil Rule 26(e)(2).[1]

In reply, Mrs. Yabuki argues that her injuries resulting from the bicycle accident were minor and limited to a sore chest and cut knee. She also contends that the jury never saw her walking around the courtroom as the jury was in recess when she walked to and from the witness stand and during the remainder of the trial she remained seated at counsel table. Further, she denies a duty to amend any of her prior responses to discovery, contending that her responses remained accurate after the bicycle accident.

The standard of review on appeal of a trial court's denial of a motion for new trial is that the trial court's action must be sustained unless the appellate court is convinced that the trial court abused its discretion in ruling as it did. *See Montgomery Ward v. Thomas*, 394 P.2d 774 (Alaska 1964). The triggering requirement of Rule 26(e)(2)—that a response though correct when made be no longer correct under circumstances such that a failure to amend is in substance a knowing concealment—appears not to have been met. Babinec has not directed us to any discovery response which became untrue because of the bicycle accident. In argument before the trial court, Yabuki's counsel acknowledged a duty to update, but contended that the bicycle accident was an insignificant event. It is thus unclear whether this was meant to be a concession that Rule 26(e) was

violated, and the trial judge seems not to have so considered it. He denied the motion for a new trial, as well as the first motion for relief from judgment under Civil Rule 60(b), on the grounds that any "discovery confusion" was not "deliberately generated" by the Yabukis, a conclusion which seems inconsistent with the knowing concealment requirement. In any case, the trial judge could reasonably have concluded that no Rule 26(e)(2) duty arose in view of the equivocal nature of counsel's statement taken together with the fact that no incorrect response was identified.

With respect to the alleged harm caused by Yabuki's failure to disclose the bicycle accident, the trial court was in a better position than is this court to determine whether Mrs. Yabuki presented herself through her posture and gait as a person in severe pain. On this record we have no basis for concluding that the trial court, in resolving the arguments of the parties, committed an abuse of discretion.

2. Pre-accident treatment of back pain by Dr. Okamoto.

Before the trial court ruled on the motion for a new trial relating to the bicycle accident, Babinec made a motion for relief from judgment under Civil Rule 60(b)(2) and (3), contending that he had recently discovered that Mrs. Yabuki had been treated for back problems by Dr. Okamoto in Japan less than 90 days prior to the accident at the apartment. Babinec contended that this was "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)" and that he was thus entitled to relief pursuant to Civil Rule 60(b)(2).[2] In addition, Babinec argued

---

1. Civil Rule 26(e)(2) provides:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the

circumstances are such that a failure to amend the response is in substance a knowing concealment.

2. Civil Rule 60(b)(2) provides:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons:

. . . .

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).

that both Mr. and Mrs. Yabuki had committed perjury by withholding this information and by giving false responses and answers to interrogatories and requests for production and that these derelictions amounted to "fraud ... misrepresentation or other misconduct of an adverse party ..." entitling Babinec to relief from the judgment under the provisions of Civil Rule 60(b)(3).[3]

The misrepresentation and misconduct which formed the basis of this motion are as follows:

1. At her deposition, Mrs. Yabuki testified that she had gone to Dr. Okamoto on various occasions as a follow-up to her 1966 fusion surgery. However, she falsely stated that she had not seen Dr. Okamoto in the five years before the accident for health care, although she had seen him socially.

2. Mr. Yabuki testified at his deposition that Mrs. Yabuki did not have any back pain following the 1966 fusion operation until the fall on the apartment stairway. This answer was false.

3. An interrogatory was submitted to Mrs. Yabuki asking her to "[s]tate whether you have ever had prior treatment for your back condition, that pre-dated this accident...." The answer given related only that Mrs. Yabuki had been hospitalized in San Mateo, California in 1965 for back pain from a prior injury and this condition was corrected in May of 1966 by surgical fusion performed in Japan by Dr. Okamoto. This answer was false because Mrs. Yabuki did receive treatment for back pain in 1983 and 1984.

4. A request for production asked for "[a]ll prior medical records relating to back injuries or back claims." The record before us is not clear as to exactly what was produced in response to this request, but it is clear that Dr. Okamoto's records pertaining to treatment of Mrs. Yabuki in 1984 before the accident were not produced.

The trial judge denied the motion, giving his reasons in an oral decision.[4]

The record shows the following concerning the facts underlying the motion and the Yabukis' explanation for their false responses.

Shortly after the accident, Roberta Halcro, an investigator working for Babinec's insurance company, interviewed the Yabukis. She was told that Mrs. Yabuki had had surgery which fused two vertebrae in 1966, performed by Dr. Okamoto in Japan. Halcro understood Mrs. Yabuki to say that she had been recently treated for back pain in Japan. Her notes state that "[Mrs. Yabuki] had pain in back prior to fall—was in Japan for treatment.... [Mrs. Yabuki] returned to U.S. on 3/16—felt fine [no problems with] back [and] on 3/30 fell on steps."

Babinec's investigator interviewed Dr. Okamoto shortly after the trial. According to the investigator, Dr. Okamoto gave him medical records indicating that Mrs. Yabuki was seen on January 6, 1984 and given "an injection of pain medication in her back." On January 9, 1984 she had an x-ray of her back. According to the investigator, Dr. Okamoto's records relate follow-up visits for back pain on January 11, January 19, and January 27, 1984. Dr. Okamoto's records are largely written in Japanese and, according to the investigator, in a sort of medical shorthand which cannot be literally translated. Nonetheless, the investigator avers that Dr. Okamoto confirmed the truth of the information related above.

In an interview conducted with Dr. Okamoto after the trial court had ruled on the initial 60(b) motion, further details of Dr. Okamoto's treatment of Mrs. Yabuki in the five years before the accident emerged. According to a note of confirmation signed by Dr. Okamoto, in 1979 Mrs. Yabuki had an x-ray examination on account of her

---

**3.** Under Civil Rule 60(b)(3) a party may be relieved from a judgment for:

> fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

**4.** The text of Judge Ripley's ruling is set forth below at note 8. Following this ruling Babinec made a second motion for relief under Rule 60(b)(3) based on an additional interview with Dr. Okamoto. This motion was denied without comment by the trial judge.

back pain; in 1981 she consulted with Dr. Okamoto regarding knee joint pain; in December of 1981 she had several injections of pain medication in her back; and "from January to March 1984, she received antibiotics and analgesics for panaritinm on her hand. Simultaneously she had x-ray examination and three injections for her back pains."

Mrs. Yabuki, in an affidavit filed in opposition to the first motion for 60(b) relief, denied making any intentional misrepresentations. She recalled seeing Dr. Okamoto in Japan in December of 1983 and January of 1984 "mainly for treatment of an infected finger." Dr. Okamoto eventually removed her fingernail on January 27. She stated that when she went to Dr. Okamoto's office in late December of 1983, she saw an assistant about her finger, who told her to keep her hand elevated above her heart. She related that this caused her discomfort to her arm and back. Her translated affidavit states:

> I must have mentioned this to Dr. Okamoto and he gave me a muscle injection of pain medication. Even now after reviewing these records, I do not remember such injection.... If it had been a "spinal injection" like the others I later received, I would have remembered it. I do not remember it because, if anything, it was pain medication to relieve my discomfort from my travel fatigue, weight loss weakness, and having to keep my arm above my heart. [This type of discomfort] was completely different from the pain I have experienced after my fall.

Mrs. Yabuki also states that she had earlier asked Dr. Okamoto for all of her medical records and that he had stated that he had delivered to her all that he had and that these records were given to counsel for Babinec. Dr. Okamoto "stated [that] he did not want to get involved in any litigation."

In response to the second motion for 60(b) relief, Mrs. Yabuki filed an affidavit stating in part:

> Even though I don't specifically recall any x-rays being taken of my back in 1979, I do not disagree with the state-

ment that such was performed since it was not unusual for Dr. Okamoto to periodically check to see how the operation to fuse my vertebra was holding up. I do know, however, that there was never a time when that surgery created any pain for me. I have always distinguished pain emanating from my spine from pain emanating from just back muscles....

> Neither at the time of the trial nor at the time of my deposition do I recall the consultation in 1981 regarding knee joint pain or receipt of injections of pain medication.... Further I would like to reiterate that in Japan pain medication is more traditionally given by injection than through pills. The injection is given in the low back regardless of the source or location of the pain. So in 1981 if I had knee joint pain for which I was given a pain injection, the pain injection would have been given in my low back even though the pain was in my knee joint.

> As concerning the treatment as mention[ed] from January to March 1984, I refer to my previous affidavit submitted in opposition to Defendant's prior motion for a relief from judgment. Therein I indicated that the entry was for treatment of an infected finger ultimately requiring the removal of the fingernail. This also requiring my hand to be held above my heart causing muscle discomfort in my back for which I ultimately received injections of pain medication, again, in my back. In the affidavit I further indicated that the x-rays referred to were more out of a fear of cancer as opposed to other problems. Additionally, maybe Dr. Okamoto also utilized that opportunity to check the fused vertebrae. I again reiterate as before, that neither at the time of my deposition nor at the time of the trial did I recall such treatment.

In further opposition to the second motion for 60(b) relief, the Yabukis filed an affidavit of an American physician that stated that systemic pain injections would most commonly be given in the "upper

butt/low back area" regardless of the source of the pain.

Mr. Yabuki also filed an affidavit in opposition to the motion for relief from judgment, stating that his wife's main purpose for seeing Dr. Okamoto in Japan in January of 1984 was for an infected finger. He stated that he did not recall her having been specifically treated for any back problems.

In addition, Ronald Offret, counsel for the Yabukis, filed an affidavit setting forth that he had provided Babinec's attorney with all medical records which he had in possession or of which he had any knowledge. He allowed Babinec's counsel to review his complete file, including medical records, to confirm that this was so. Offret stated in addition that he had been advised by Mrs. Yabuki, "that Dr. Okamoto has been adamant in his assertions that he did not want to get involved and that he had provided all of the medical records he intended to provide."

Mr. Yabuki's deposition was taken on January 7, 1988. He was asked what doctors had treated Mrs. Yabuki in Anchorage and gave the name of, among other doctors, Dr. Beacham. In addition, Mr. Yabuki gave the names of two firms of physical therapists who had treated Mrs. Yabuki. The Yabukis furnished Babinec's counsel with a general release of medical information, authorizing all physicians and other health care providers who had treated Mrs. Yabuki to furnish defense counsel with copies of medical records. Defense counsel obtained Dr. Beacham's medical records and the records of a physical therapist, Mr. Hileman, whose firm Mr. Yabuki had mentioned. He also sent a copy of the authorization to Dr. Okamoto, but received no response.

Dr. Beacham's records reveal that Mrs. Yabuki was seen for chest pains and suspected angina in the fall of 1983 which resulted in a 10–day hospitalization in November of 1983. Dr. Beacham mentioned in a record note in September of 1983 that Mrs. Yabuki was also having problems with low back pain. He referred her for treatment for this condition to Mr. Hileman who treated her 12 times in October and November of 1983. Dr. Beacham's records contained numerous references to medical treatment which Mrs. Yabuki had received in Japan between 1983 and the time of trial.

Mrs. Yabuki's deposition was taken on May 2, 1988, after Babinec's counsel had obtained Dr. Beacham's and Mr. Hileman's records.[5] Defense counsel asked Mrs. Yabuki the following questions and received the following answers at the deposition:

Q: Before the accident in March 1984, had you seen any doctors in Alaska about your back?

A: No.

Q: Before the accident in March 1984, had you seen any physical therapists about your back?

A: Unconditional. Like a conditional treatment or something like that you're asking?

Q: My question is, before the accident in March of 1984, had you seen any physical therapist about your back?

A: No.

Defense counsel did not confront Mrs. Yabuki at her deposition with the records of Dr. Beacham and Mr. Hileman, which clearly indicated that Mrs. Yabuki's quoted answers were not true. Instead, counsel used Mrs. Yabuki's answers at trial. Her negative responses were brought to the attention of the jury through cross-examination, and defense counsel then called both Dr. Beacham and Mr. Hileman to testify. In closing argument to the jury, defense counsel stressed the inconsistencies between Mrs. Yabuki's deposition answers

---

5. At the deposition, Babinec's counsel, although he had been told by the Yabukis that there were no more records from Dr. Okamoto, indicated that he thought that this was not so. He stated:

I don't think I have all of those underlying records. And traditionally in the United States where this lawsuit is taking place, people do take medical releases and try to get the original documents from the treating doctor. And part of our system is that I am entitled to do that. And I'm sorry that there's a misunderstanding with Dr. Okamoto, but I still would like to get the documents directly from him.

and Dr. Beacham's and Mr. Hileman's records. He also stressed that records from Mrs. Yabuki's visits to Dr. Okamoto in early 1984 were missing.[6]

**6.** Defense counsel began his closing argument sounding the twin themes of Mrs. Yabuki's lack of candor and the missing records of Dr. Okamoto. He stated:

> Your Honor, members of the jury, this case isn't just about what Mrs. Yabuki failed to tell us in her deposition. It's also about the missing medical records of Dr. Okamoto, the doctor that is her friend from Japan, the doctor whose children are friends with her children.

Later in the argument, counsel continued in a similar vein:

> This case is also about some documents that should not be here. Mr. Yabuki answered written questions about prior treatment for Mrs. Yabuki's back condition. He did not tell us anything about any treatment in 1983. Mrs. Yabuki denied in her deposition that she had any treatment in 1983. She denied that she had any physical therapy and she denied that she'd seen any doctor about her back. There should not be any physical therapy records from 1983 in this case, but there are. There's 12 sessions and they're showing on Buck Hileman's records. That's Exhibit B which you'll get to take with you.
>
> There should not be any doctor's reports from 1983 that make reference to back pain. She's not in back pain in 1983, but there's Dr. Beacham's records. That's Exhibit C. I'll read off my copy of the notes because I can clip it and it's convenient, but it's there and you'll get to take it with you to the dep——to the jury room. September 29, 1983, she continues to do everything she wants to do and is actually more limited by low back pain than cardiac problems at this time. She did have a diskectomy, a fusion of the L-4 and 5 vertebra many years ago for disk disease. Only recently has she started to have recurrent problems with her low back pain. Down at the bottom, the plan—I'm scheduling her for physical therapy for her back. That record shouldn't be in this case because they both said she had no pain in 1983, but the record is there.

Counsel then returned to the missing records from Dr. Okamoto:

> You have in evidence Exhibit A which are the interview notes of Ms. Halcro. She talked to the Yabukis on May 2nd, 1984. She wrote down what they said. She wrote down claimant had pain in back prior to fall, was in Japan for treatment. Heat massage, special diet and finally, traction. Claimant returned to U.S. on 3/16, felt fine, no problems with back. On 3/30, fell on steps. Where are those records from Dr. Okamoto? They're the important records in this case but they're not here. Dr. Okamoto got my letter.
>
> If you look at Exhibit B which is, again, Buck Hileman's physical therapy records, you'll see the calendar of treatment that shows that he did treat her 12 times in Octo-

ber and November of 1983, but then he wrote on November 15, 1983, patient has not been seen in PT, physical therapy, for some time. It is assumed patient no longer requires our services. Mr. Hileman was actually incorrect about that because if you look at Dr. Beacham's records, you'll see that she went into the hospital instead. She was in the hospital from the 12th of November of '83 until the 23rd of November of '83, where they were investigating her heart pains.

> Now, I think you'll recall that I specifically asked Mr. Yabuki about that. It's difficult to remember exactly when somebody would be in the hospital, so I refreshed his memory with that record and showed him that yes, his wife had been in the hospital in November of '83 and then I asked him whether he and his daughter, Agnes, or she and his daughter, Agnes, had gone to Japan in December and they did. So, we have a history where Mrs. Yabuki gets referred for back pain to a physical therapist. She's treated, she goes in the hospital, she gets out of the hospital, she goes to Japan and when did she come back? Exhibit A, Halcro's notes, said she returned on 3/16. She doesn't come back until March. She was in Japan for three months and these notes say that she's getting medical treatment in Japan for those three months, and Dr. Bosveld's records confirm that she just came back from Japan just before he saw her on the 5th of April. The first note, lady has returned from Japan.

> Why did she come back from Japan on March 16th? That's because her son, Doug, came home for a college break. Now, I don't doubt that she felt a little better with her son home because her family is important to her, but she has a history of treatment. Mr. Hileman is wrong on that note saying she didn't need any more treatment. The fact that she went into the hospital and then she went to Japan for three months of treatment and they didn't produce those records.

In reply, counsel for the Yabukis did not contest that Dr. Okamoto had failed to transmit his records and appeared to acknowledge that Mrs. Yabuki had seen Dr. Okamoto for the same type of pain which she had mentioned to Dr. Beacham. Counsel stated:

> Why didn't Dr. Okamoto send the records? I don't know why and you don't know why. Mr. Waggoner [counsel for Babinec] would have you infer that there is some real suspicious reason for that. Well, there isn't. The simple fact is that they are not here. It is a piece of evidence that you are not going to be able to rely on to make your decision. That's all it is. It's not here. The simple fact is, is the pain was different. It is a different type of pain. The pain is generated from swollen nerves, pinched nerves, those things that were caused as a result of this accident.

Babinec did not base his motion on the false answers relating to back pain suffered by Mrs. Yabuki in 1983 for which she received physical therapy treatment on referral by Dr. Beacham. Instead, as noted, the motion is based on the false answers concerning 1984 treatment by Dr. Okamoto and the fact that Dr. Okamoto's records for 1984 were not produced.[7]

At oral argument on the first 60(b) motion, the trial judge suggested that Mrs. Yabuki's false answers might be ascribable to language difficulties as Mrs. Yabuki testified in Japanese and apparently speaks almost no English. In his oral decision, the trial judge found that the Yabukis had not intentionally misled Babinec, that Babinec

had not shown due diligence, and that Babinec had made a tactical decision not to obtain information from Dr. Okamoto.[8]

Motions for relief from judgment brought under Civil Rule 60(b) are addressed to the sound discretion of the trial court and are reviewable on appeal only for an abuse of discretion. We have defined the latter as existing only where the appellate court is left with a definite and firm conviction on the whole record that the trial judge has made a mistake. *Alaska Placer Co. v. Lee*, 502 P.2d 128, 132 (Alaska 1972).

We turn first to the 60(b)(2) grounds (newly discovered evidence) argued by Babinec. Five elements must be met in order for a judgment to be set aside under Rule

---

**7.** Babinec did refer to nonproduction of the Beacham records and the physical therapy notes in his reply memorandum, but not in his initial motion or memorandum. The misrepresentations concerning the Beacham/Hileman treatment and nonproduction of their records would be a much weaker ground than reliance on false information concerning Dr. Okamoto's treatment. Counsel was completely advised of the true state of affairs concerning Dr. Beacham and Mr. Hileman's treatment well before the trial.

**8.** The trial judge stated in relevant part:

Another unusual aspect of this case, and it annoys me, but it does not arise to the kind of rational series of building blocks that I could put together to conclude that the discovery confusion in this case was deliberately generated by the plaintiffs, for the purpose of leaving defendants—misleading them in a way that they could not prepare.

It has a stirring ring when Mr. Waggoner says, you know, "If they're not going to be candid with us, we can't find these things, we don't know where to look." In point of fact, there hasn't been any suggestion that there's anything in Japan other than in the doctor that we've known about since Day One.

I find it very significant in that the defense had, from the Halcro notes, these really early warnings that there was more to look at than they did.

I honest-to-goodness cannot fault the defense from the standpoint of suggesting that they should have invested another $60,000.00 in trial preparation for this case. I suppose in the ordinary course of human events, that decision itself might be criticized, because I think even plaintiff's counsel might in his heart agree that this was an unexpected, although not irrational, or any of the other standards that require it to be set aside, it was an unusually—it was not a ninety-fifth percen-

tile foreseeability that this verdict went this way.

And so in these days of escalating litigation costs and attorneys being charged with overcharging their clients, I can see how decisions would be made, both by Mr. Waggoner and probably, most certainly, by his principals at the carrier's office, not to pursue this to the extent of a Japanese expedition, as it's been referred to, to track down some of these things in a final way. But those things were in fact known to the defense. Certain judgments were made, and they have to live by them.

If that amounts to lack of due diligence, then let me be clear. I do premise my ruling on this matter by saying that the—this does not arise to a *Rozier* and related cases showing of interference or impeding legitimate discovery, such that it would support a Rule 60 motion.

Certainly a lot of suggestions are suspicious, but there are at least rational arguments to be made on the other side of each coin which would account for the discovery failures, if you will, at least to the point of preventing me from being convinced that it amounts to the kind of deliberate hide-the-ball that I've been speaking of, which would require me on my own motion to take action on the verdict.

So it is—there wasn't the *Rozier* impediment. There was sufficient knowledge available and the mechanism available for defendants to have pursued, had they opted to do so. So that these various suggestions would not be tried now by affidavit and by argument of counsel. But we could have litigated all of this after full, much more expensive, that's true, discovery, could have done all the trial things.

For those reasons, the motion for a new trial/remittitur is denied in its entirety. And the applications for relief from judgment and for dismissal will likewise be denied.

60(b)(2). The newly discovered evidence must:

(1) be such as would probably change the result on a new trial;

(2) have been discovered since the trial;

(3) be of such a nature that it could not have been discovered before trial by due diligence;

(4) be material;

(5) not be merely cumulative or impeaching.

*McCall v. Coats*, 777 P.2d 655, 657 (Alaska 1989). As noted above, the trial court found a lack of due diligence in seeking information from Dr. Okamoto.

The trial court's conclusion that due diligence was not exercised seems well supported. As Babinec's counsel pointed out at Mrs. Yabuki's deposition and in final argument to the jury, it was evident that Mrs. Yabuki had been treated by Dr. Okamoto in 1984.[9] He knew that he had sent a medical release to Dr. Okamoto with a request for records and had received no response. Instead of pursuing the matter further by arranging a deposition of Dr. Okamoto, the trial court found that counsel made the decision to use the absence of records from Dr. Okamoto as a device to attack the credibility of the Yabukis' claims. Under these circumstances, the trial court's conclusion that Babinec did not use due diligence to obtain Dr. Okamoto's information and records is not an abuse of discretion.

■ We next discuss the 60(b)(3) aspect of Babinec's motion.

One who asserts fraud, misrepresentation or misconduct as a ground for relief under Civil Rule 60(b)(3) has the burden of proving those assertions by clear and convincing evidence. *McCall v. Coats*, 777 P.2d at 658. The conduct complained of must be material in the sense that it prevented the losing party from fully and fairly presenting his case or defense. *Id.* Where the misconduct in question relates to falsehoods conveyed in the course of discovery, the information withheld need not be of such nature as would necessarily alter the result in the case. "This subsection of the rule is aimed at judgments which were unfairly obtained, not at those that are factually incorrect." *Id.* at 658, (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir.1978)).

As noted previously, the trial court concluded that the Yabukis had not made purposeful misrepresentations. While there is record support for this conclusion and it is thus not an abuse of discretion, it is also not a complete answer to a motion premised on Rule 60(b)(3). A misrepresentation, or misconduct, need not be accompanied by an intent to deceive in order to fall under the rule:

It takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that they deny the opposing party a fair trial. Accidents—at least avoidable ones—should not be immune from the reach of the rule. Thus ... depending on the circumstances, relief on the ground of misconduct may be justified "whether there was evil, innocent or careless, purpose."

*Anderson v. Cryovac Inc.*, 862 F.2d 910, 923 (1st Cir.1988) (quoting *Bros Inc. v. W.E. Grace Manufacturing Co.*, 351 F.2d 208, 211 (5th Cir.1965)).

An intent to deceive is not irrelevant, however, under Rule 60(b)(3). Where such exists, the burden may shift to the nonmoving party to prove that the misconduct did not interfere with the full and fair presentation of the case. *Id.* Where, however, there was no intent to deceive, the burden remains on the movant to show that he was prevented by the misconduct from a full and fair presentation of his case or defense. *Id.* at 924.

Although the trial court did not explicitly address the question of whether Babinec was prevented from presenting a full and fair defense by the misconduct of the Yabukis, his remarks are sufficiently detailed so that this court may determine how the trial court would have decided that question.

---

9. The trial took place some two and one-half months after the deposition.

The trial court's determination that Dr. Okamoto's information and documents were not pursued because of a tactical decision, is, in essence, a determination that the defense was not deprived of a full and fair litigation opportunity.[10]

We are not convinced that the trial court's implicit determination that Babinec was not deprived of a full and fair opportunity to litigate was mistaken. Counsel appears to have made a considered decision to rely on the Yabukis' discovery misconduct before the jury rather than to take steps to obtain the information that he knew he did not have. Further, Dr. Okamoto's information and records, as currently presented, seem to present information no different in kind than the information regarding back pain suffered by Mrs. Yabuki in the fall of 1983 as reflected in the records of Dr. Beacham and Mr. Hileman.

### 3. Evidentiary rulings.

Babinec's third claim of error is that the trial court erred in two evidentiary rulings.

The first concerns testimony by Mr. Yabuki that while he was a student at the University of Washington at the outset of the Second World War, he was ordered to an internment camp where he spent the war years with his family. He testified that during that period he somehow lost his United States citizenship and at the close of the war he was sent to Japan, even though he had never been there before and spoke only a little Japanese.

▋ Counsel for Babinec objected to this testimony as irrelevant. The objection was overruled on the grounds that his significant background experiences were relevant to his claim for loss of consortium. In allowing the testimony, the trial court admonished the jury, stating:

> On that basis, I'm going to overrule the relevance objection, ladies and gentlemen, and so that you may fully understand Toyoshi Yabuki's whole psyche

when he tells you about, apparently, the loss that he suffered by virtue of his wife's claimed injury, I'm going to allow it. I will remind you now as I will remind you later, however, that information which you find simply goes to creating sympathy is to be viewed with certain suspicion.

Babinec claims on appeal that this evidence was irrelevant to Mr. Yabuki's loss of consortium claim and it was offered solely to create prejudice and sympathy.

The Yabukis argue that the fact that Mr. Yabuki "did not enjoy a full life as a young man is relevant to the magnitude of his loss in now being deprived of his opportunity to enjoy his retirement with his wife." Thus, they contend, the evidence was relevant on the question of damages to be assessed for his loss of consortium claim.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Alaska R.Evid. 401. The jury was instructed that consortium damage

> is the fair value of the loss of society, comfort, care, protection, affection and companionship that [Mrs. Yabuki] reasonably would have provided her husband if she had not been injured.
>
> In fixing this amount you may consider, among other things, evidence relating to the closeness and harmony of the relationship between [Mrs. Yabuki] and her husband.

Mr. Yabuki's claim that his circumscribed and painful experiences during and after the Second World War have a bearing on the closeness of his relationship with his spouse is well within the realm of human experience. Thus we conclude that the court did not err in ruling as it did.

▋ Babinec goes on to argue that even if the evidence was marginally relevant, it

---

10. The court stated, in part:
 In point of fact, there hasn't been any suggestion that there's anything in Japan other than in the doctor that we have known about since Day One.... But those things were in fact known to the defense. Certain judgments were made, and they have to live by them.... There was sufficient knowledge available and the mechanism available for defendants to have pursued, had they opted to do so.

should have been excluded, as its relevance was outweighed by the fact that it would create undue sympathy for Mr. Yabuki. Relevant evidence may be excluded by a trial judge "if its probative value is outweighed by the danger of unfair prejudice. . . ." Alaska R.Evid.P. 403. Such decisions are committed to the sound discretion of the trial judge.

In this case, particularly in view of the cautionary instruction given by the trial judge, we find no abuse of discretion. Mr. Yabuki's mistreatment by the government of the United States during the Second World War is not the sort of overmastering event that carries with it a high risk that the jury would decide his case on an emotional basis rather than on the facts. *Cf. Patricia R. v. Sullivan*, 631 P.2d 91, 96 (Alaska 1981) (evidence that mother had acted as a prostitute carried with it danger that jury would react with "overmastering hostility" in personal injury case brought by her on behalf of her minor child against a third party). In our view, the challenged evidence was not of a character likely to induce the jury to set aside its obligation to decide the case on the evidence presented.

■ Babinec's second evidentiary point relates to cross-examination of claims investigator Roberta Halcro. Yabukis' counsel asked her if on the date she first interviewed the Yabukis she "desired or wished them to basically release Babinec apartments from liability on this situation." This was objected to, but Halcro was allowed to answer and she answered in the negative. In rebuttal, Mr. Yabuki testified over objection that Halcro did ask him to sign a release.

This testimony should not have been allowed according to Babinec because it amounted to a reference to insurance.[11] This argument lacks merit as no mention was made of the fact that Halcro was employed by an insurance company. It is as normal for those who are self-insured,

or uninsured, to desire releases from liability as it is for those who are covered by liability insurance. One might say, in counter to this, that normally only those who are insured employ claims investigators. But if an inference of insurance is to be drawn from that fact, it is not the fault of the Yabukis as Ms. Halcro was identified by Babinec's counsel on direct examination as a claims investigator.

4. Remittitur.

■ Babinec's next point on appeal is the trial court should have granted a remittitur because the verdict was excessive as to Mrs. Yabuki. Such a question is uniquely within the province of the trial court, who has had a much greater opportunity than an appellate court to appreciate the details and nuances on which damage awards may properly be based. The trial court's determination must stand unless the appellate court holds a definite and firm conviction that the trial court has made a mistake. *Nat'l Bank of Alaska v. McHugh*, 416 P.2d 239 (Alaska 1966).

There was evidence that Mrs. Yabuki's injury was a serious one. She suffered spinal damage that resulted in permanent chronic pain in her legs and back. She requires periodic spinal injections and she may need these for the rest of her life. She cannot stand for any substantial time and spends much of her time in bed. Sexual relations are as yet impossible. There was evidence that the pain she is undergoing has changed her personality and affected her relationships with her husband and her daughter.

She had incurred medical expenses of $31,132.90 as of the time of trial, and will continue to require medical treatment for the remainder of her life—her life expectancy was 21.4 years. Her counsel calculated such expenses to be approximately $50,-000 and there was evidentiary support for that calculation. Substitute domestic services, again with an evidentiary basis, were

---

11. Evidence Rule 411 states in relevant part: Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require

the exclusion of evidence of insurance against liability when offered for another purpose such as proof of agency, ownership, or control, or bias or prejudice of a witness.

calculated by counsel at as much as $208,-000. Less tangible damages, such as past and future pain and suffering and loss of enjoyment of life could reasonably account for the balance of the verdict.

Babinec argues that Mrs. Yabuki would have had the back pain she has even if the accident had not taken place. This, however, was a much disputed point and it was resolved by the jury against Babinec. Babinec also cites a publication entitled *Injury Valuation Reports* published in 1977, which he claims places the verdict range for injuries like those suffered by Mrs. Yabuki between $20,000 and $250,000. In our view, the assessment of damages is too fact specific for publications such as this to be of much value in determining remittitur questions.

For the above reasons, we are not convinced that the trial judge erred in denying the motion for remittitur.

5. **Jury instructions.**

 Babinec also alleges error in two of the instructions given to the jury. He challenges Instruction 20 which provides that the jury could award Mrs. Yabuki compensation for the burden the injury has imposed on her ability to participate in "normal activities in life." [12] He also challenges Instruction 21 which allows the jury to compensate the amount of loss caused by her reduced ability to provide future services as a housewife.[13]

Specifically, Babinec argues that neither Instruction 20 or 21 was supported by evidence as to the amount of these damage claims. Second, he argues that "taken together, [they] invite the jury to award Mrs. Yabuki a double recovery" because "a major part of her pleasure is derived from fulfilling her housewifely duties for her husband."

As to the first contention, we believe with regard to Instruction 20 that the jury could sufficiently determine the damage to Mrs. Yabuki's participation in normal life activities based on the testimony about her chronic pain, about her difficulties walking and standing, and about the tensions introduced to her family relationships. The damages in this regard are not easily measured. Contrary to Babinec's suggestion, plaintiffs are not required to suggest an amount. The inquiry is not prohibited provided the jury has been adequately informed of the disabilities resulting from the defendant's conduct. *See Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 561, 61 S.Ct. 379, 385, 85 L.Ed. 336, 343 (1941); *Jacqueline's Washington Inc. v. Mercantile Stores*, 80 Wash.2d 784, 498 P.2d 870, 871 (1972). This occurred here.

 With regard to Instruction 21 on the value of household services, evidence of the cost to hire someone to perform the tasks formerly done by Mrs. Yabuki was presented.[14]

---

**12.** Jury Instruction 20 states:

The second item of claimed loss is the inability, because of disfigurement or physical disability, to participate in normal activities in life such as inability to participate in sports or recreational activities, hobbies, social affairs, and other activities that make up the pleasures of life.

You may award a fair amount to compensate the Plaintiff for any loss of this type experienced from the date of injury, March 30, 1984, to the date of trial, July 18, 1988, and for any similar loss reasonably probable to be experienced in the future. In deciding how long the Plaintiff may experience such loss in the future, you may need to consider her current life expectancy.

**13.** Jury Instruction 21 states:

Another item of claimed loss is the value of the services as a housewife lost by the Plain-

tiffs from the date of the accident, March 30, 1984.

You may award the Plaintiffs a fair amount for any reduction in her future ability to provide services as a housewife that she is reasonably probable to experience. In fixing this amount, you must determine the difference between the Plaintiff's ability to perform housewife services before the accident and her ability to perform them after the accident with regard to her life expectancy as it then existed. To do this you may consider the Plaintiff's health, physical and mental abilities, her work habits and performance before the accident and the nature and the extent of her injuries and how long and to what extent her injuries will affect her ability to perform those services in the future.

**14.** Mr. Yabuki testified as follows:

We are not persuaded by Babinec's second point, assuming he is correct that Mrs. Yabuki derived satisfaction from performing household services. We find no double recovery in compensating the Yabukis for the monetary costs of replacing Mrs. Yabuki with paid "domestics" while also compensating Mrs. Yabuki for the lost pleasure she had experienced doing such tasks herself.

6. Attorney's fees.

 The trial court awarded the Yabukis attorney's fees of $89,650.41 pursuant to the schedule of Civil Rule 82(a)(1). Babinec challenges this award, again on two grounds. First, he argues that "time itemization" of opposing counsel's services should have been required. He urges that such records should be required in all cases, but especially those "where there is an extremely large verdict, with a very substantial potential of producing disproportionately large fees." *See Alyeska Pipeline Service Co. v. Anderson,* 629 P.2d 512 (Alaska 1981) (trial court may deviate from Civil Rule 82(a)(1) where application of that rule's formula would provide an award disproportionately large in view of the time devoted to the case).

Attorney's fees awards made pursuant to the schedule of Rule 82 are presumptively correct. *See Alaska Airlines v. Sweat,* 584 P.2d 544, 551 (Alaska 1978) (when awarding attorney's fees according to schedule, no explanation is required). The prevailing party bears no burden to justify such awards, thus time itemization is not required.

 Babinec's second challenge alleges that the trial court erred in amending the Yabukis' attorney's fees award. The Yabukis realized after the court first entered judgment that their attorney's fees motion, requesting application of the formula, misstated the amount owed. Instead of applying the formula to the actual judgment (the jury verdict plus prejudgment interest), they computed it using only the jury verdict.[15] This error is reflected on the Prejudgment Computation Sheet, a court-prepared form on which the prejudgment interest was computed and added to the verdict. Upon realizing the error, they recomputed their attorney's fees and requested the court modify its judgment to reflect the new total. They did so pursuant to Civil Rule 60(a)[16] which permits the court to correct "clerical mistakes" in judicial decisions and records. The trial court granted the motion. As a clerical mistake may include those made by a party, the trial court did not abuse its discretion in amending the judgment. *See* 6A J. Moore, *Federal Practice* § 60.06[3] at 60–43 (1986) ("Relief may be had from clerical mistakes of the court, clerk, jury or party.")

For the foregoing reasons, we affirm the judgment.

---

Q. Have you—have you considered having someone come in and assist you for pay for those domestic services?

. . . . .

Q. ... [H]ave you considered how many hours a day you feel that it would—that someone would be required to come into your home?
A. At least four hours.
Q. And, would that be—how many days a week?
A. Oh, five or six.
Q. Okay. So, that would be 20 to 24 hours a week?
A. Yes. sir.

. . . . .

Q. Have you—have you taken a look at charts, or whatever, concerning what the rate would be to have someone come in and do that?

A. Yes, sir.
Q. And, what—what's the—about the approximate rate that you—....
A. Minimum of $10.00 an hour.

15. *See ERA Helicopters v. Digicon Alaska, Inc.,* 518 P.2d 1057, 1063 (Alaska 1974) (award of prejudgment interest is part of the money judgment and is to be included in computing attorney's fees).

16. Civil Rule 60(a) provides:
Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time on its own initiative or on the motion of any party and after such notice, if any, as the court orders....