*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MAX and PEGGY ESPELAND, | ) | |
| | ) | Supreme Court Nos. S-14571/14931 |
| Appellants, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3AN-09-10994 CI |
| | ) | |
| ONEWEST BANK, FSB; INDYMAC | ) | O P I N I O N |
| FEDERAL BANK, FSB; INDYMAC | ) | |
| MORTGAGE SERVICES; and | ) | No. 6885 – March 28, 2014 |
| ALASKA TRUSTEE LLC, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances:  Max and Peggy Espeland, pro se, Anchorage, Appellants. Scott J. Gerlach, Delaney Wiles, Inc., Anchorage, for Appellees OneWest Bank FSB and IndyMac Mortgage Services. Richard N. Ullstrom, Routh Crabtree Olsen-Alaska, Inc., Anchorage, for Appellee Alaska Trustee, LLC.

Before:  Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.      INTRODUCTION

In 2005 Max and Peggy Espeland refinanced their home with E-Loan, Inc. Shortly thereafter, their loan was purchased by another bank and securitized.  The

Espelands eventually defaulted on the loan and their home was sold in a non-judicial deed of trust foreclosure. The Espelands brought an action in the superior court to void the sale, arguing mainly that inconsistencies in and multiple transfers of the loan and security documents caused defects in the chain of title. The superior court disagreed and granted summary judgment against the Espelands. The Espelands filed an appeal. Thereafter, the Espelands moved for relief from judgment, citing fraud by the defendants. The superior court denied this motion. The Espelands filed a second appeal, and we consolidated the two appeals for decision. Because the Espelands have not produced any evidence of defects with the chain of title or with the foreclosure, we affirm the superior court's grant of summary judgment. Because after reviewing the record we see no evidence of fraud or malfeasance, we affirm the superior court's denial of the motion for relief from judgment.

## II.    FACTS AND PROCEEDINGS

In 2004 Max and Peggy Espeland purchased an 8,000 square foot, eight bedroom, ten bathroom home for $775,000. The previous owners, the Schefers, had been using the property as a bed and breakfast, and the Espelands intended to do the same. Neither Max nor Peggy had any experience running a small business or working in the hospitality industry, but they were hoping to "jump in there and . . . make it happen." Max ran a directional drill for Norcon, and Peggy did not work apart from her duties caring for the bed and breakfast. Max's work was intermittent and entailed frequent stretches of unemployment, but he believed he was earning about $70,000 annually when they purchased the property.

The Espelands originally financed the purchase with a loan from Bridge Capital. To obtain the loan, they aggregated Max's salary and the $80,000 a year that the Schefers told them the property earned. They made this choice even though Max testified he understood that the Schefers meant $80,000 before expenses, not after. To

make the down payment, the Espelands borrowed $50,000 from Peggy's parents, which they mischaracterized in their loan application to Bridge Capital as a gift.

By 2005 the Espelands were having trouble meeting their payments and wanted to refinance their loan. After looking at options, they chose E-Loan, Inc. In the loan application, Max stated that he had a monthly salary of $10,000 without mentioning that his yearly salary was much less than $120,000 due to his frequent periods of unemployment. E-Loan agreed to refinance $790,000 at a lower interest rate, which dropped the Espelands' monthly payment from $7,172 to $5,088.

The Espelands signed a Promissory Note creating an obligation to repay their loan and a Deed of Trust giving the lender, through the trustee under the Deed of Trust, the right to sell the property if the Espelands failed to repay the loan. The reference date on the Deed of Trust was September 15, 2005, and it was notarized four days later on September 19, 2005. The Deed of Trust lists E-Loan, Inc. as the lender, Pacific Northwest Title as the trustee under the Deed of Trust, and Mortgage Electronic Registration Systems, Inc. (MERS)[1] as the "nominee for Lender and Lender's successors

---

[1] In its findings, the superior court described MERS as: "a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans." Under MERS, the lender assigns its beneficial interest to MERS or appoints MERS its nominee; MERS is then the mortgagee of record. "The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record." In essence, MERS makes it easier for lenders to transfer their interests in mortgages by removing the burden of recording. The term "mortgage" generally refers to the conveyance of title to property as security for the payment of a loan or debt, and also loosely refers to the loan or debt itself. BLACK'S LAW DICTIONARY 1101-02 (9th ed. 2009). Here the specific instruments are the Promissory Note (loan) and the Deed of Trust (security interest).

and assigns."[2]  As nominee, "MERS was listed in the public record as the holder, nominally, of the beneficial interest in the property [under the Deed of Trust]."  The actual beneficial interest in the property was held by the lender, E-Loan.

## A.     Transfer Of The Rights Connected To The Loan

In October 2005, one month after the origination of the loan, E-Loan transferred all of its rights — both its servicing rights[3] and its beneficial interest[4] — to IndyMac Bank.  E-Loan endorsed the Promissory Note in blank,[5] and IndyMac Bank later added its name to the endorsement.  MERS internally recorded the transfer of the Deed of Trust and remained the nominal beneficiary of record, but was now the nominee for IndyMac Bank, not E-Loan.

---

[2]     A "nominee" is "[a] person designated to act in place of another" or "[a] party who holds bare legal title for the benefit of others."  BLACK'S LAW DICTIONARY 1149 (9th ed. 2009).

[3]     A mortgage "servicer" is an entity that performs services for the beneficiary such as collecting monthly payments.  *Id.* at 1105.

[4]     The "beneficial interest" is the "right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing," *Id.* at 885; in other words, the beneficial interest is the ultimate right to be repaid on the loan.  A "beneficiary" is the "person for whose benefit property is held in trust."  *Id.* at 176.

[5]     "In blank" (of an endorsement) is "not restricted to a particular indorsement."  *Id.* at 828.  *Black's Law Dictionary* also defines "blank indorsement" as an "indorsement that names no specific payee, thus making the instrument payable to the bearer and negotiable by delivery only." *Id*. at 844.  "Indorsement" is an alternate spelling for "endorsement."  *Id*. at 607.  The Alaska Statutes use the word "endorsement," and we follow this convention. *See, e.g.*, AS 45.03.205.

Shortly after acquiring the rights to the Espelands' loan, IndyMac Bank and Deutsche Bank National Trust Co. signed a pooling[6] and servicing agreement securitizing[7] the mortgage. This agreement sold the Promissory Note and the beneficial interest under the Deed of Trust to Deutsche Bank; the contractual servicing rights remained with IndyMac Bank. The original Promissory Note was transferred from IndyMac Bank to Deutsche Bank at this time, again endorsed in blank. MERS, still the nominee, although now for Deutsche Bank, internally recorded the transfer of the beneficial interest in the Deed of Trust. After this transfer, Deutsche Bank held the Promissory Note and the beneficial interest under the Deed of Trust, MERS continued to be listed in the public record as the nominal holder of the beneficial interest under the Deed of Trust, and IndyMac Bank continued to be the servicing agent for the loan.

## B.    The Espelands Default On Their Loan

Roughly three years later, in December 2008, the Espelands ceased making payments on their loan. IndyMac Bank contacted the Espelands and informed them that they were in default. The Espelands unsuccessfully attempted to negotiate with IndyMac Bank for a reprieve or loan modification. The record suggests that the Espelands were completely unable to make even a portion of their monthly payments; Peggy testified that after they ceased making payments, they were unable to save any money toward curing the default.

In January 2009, a month after stopping payment, the Espelands sent a Qualified Written Request to IndyMac Bank under the Real Estate Settlement Procedures

---

[6]    "Pooling" is a "grouping of assets, such as mortgages, that serves as a basis for the issuing of securities." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1370 (def'n 5) (5th ed. 2011).

[7]    "Securitizing" is defined as "convert[ing] (assets) into negotiable securities for resale in the financial market." BLACK'S LAW DICTIONARY 1475 (9th ed. 2009).

Act (RESPA).[8]  They asked for:  (1) all documents pertaining to the origination of the loan, including the loan history, fees, and the amount paid out of the escrow account; (2) an explanation of how all the payments were applied; and (3) the names and contact information for any investor or broker that purchased the securitized loan, as well as the agreements signed and the assignments made.  IndyMac Bank responded by providing the Espelands with a payment history, the "requested disclosures, [and] copies of requested closing documents."  IndyMac Bank refused to provide any of the other information, stating that  "[t]hese requests go well beyond what is required to be produced pursuant to a Qualified Written Request and will not be provided."  IndyMac Bank explained that "[g]enerally, we will not provide copies of internal documents and notations, guidelines or other information/materials supplied to us by third parties in connection with the organization of this loan."  The Espelands received the letter but never responded or followed up.

Meanwhile, IndyMac Bank had been in distress since 2008 and was under control of the Office of Thrift Supervision, becoming IndyMac Federal Bank.  The Office of Thrift Supervision appointed the Federal Deposit Insurance Corporation (FDIC) as receiver, and in March 2009 the FDIC sold all of IndyMac Federal Bank's assets to OneWest Bank.[9]  For the Espelands, this was only a transfer of the servicing rights for their loan because that was the only interest IndyMac Federal Bank retained.  In other words, this was a transfer of the contractual right to perform a service for Deutsche Bank, not a transfer of property.  MERS internally recorded the transfer of

---

[8]     12 U.S.C. § 2605(e) (2010).

[9]     *See Failed Bank Information: Information for IndyMac, F.S.B., and IndyMac Federal Bank, F.S.B., Pasadena, CA*, FEDERAL DEPOSIT INSURANCE CORPORATION, http://www.fdic.gov/bank/individual/failed/IndyMac.html (last updated Nov. 20, 2013).

servicing rights, and on April 15, 2009, IndyMac Federal Bank informed the Espelands that the new servicer of their loan was OneWest Bank.

## C.     The Non-Judicial Foreclosure

In early April 2009, OneWest Bank referred the foreclosure to Alaska Trustee, LLC, a company that performs non-judicial foreclosures. Foreclosure was ordered in the name of IndyMac Federal Bank, One West Bank's predecessor.[10] Alaska Trustee performed a routine title search and found that, although the foreclosure had been ordered in IndyMac Federal Bank's name, MERS was still the record holder of the beneficial interest under the Deed of Trust — publicly, MERS was the owner of record.[11] First American Title, the insurer for the foreclosure, required that the Deed of Trust be assigned from MERS to IndyMac Federal Bank in order to give clear title in the public record.

On April 22, 2009, MERS assigned its nominal beneficial interest in the Deed of Trust to IndyMac Federal Bank by assigning it the Deed of Trust.[12] As nominal holder of the beneficial interest, IndyMac Federal Bank held only legal title, but this gave

---

[10]     It is unknown why OneWest Bank asked for foreclosure in the name of IndyMac Federal Bank and not its own. The superior court speculated, "Perhaps it [was] because at the time OneWest initiated the foreclosure on April 3, 2009, the Espelands had not yet been notified that ownership of the servicing rights had been transferred from IMFB to OneWest, and OneWest believed this would have been confusing."

[11]     Rose Santiago, an employee of Alaska Trustee, stated in her affidavit that "[i]t is common for the actual ownership of the loan to change hands without a corresponding assignment being recorded unless and until the loan goes into foreclosure."

[12]     The actual beneficial interest — the ultimate "right or expectancy" — remained with Deutsche Bank. *See* BLACK'S LAW DICTIONARY 885 (9th ed. 2009). The assignment of the Deed of Trust to IndyMac Federal Bank simply made IndyMac Federal Bank the new nominal owner of record.

it the right to "take any action required by the lender" by "law or custom," including "the right to foreclose and sell the Property." On April 21, 2009, IndyMac Federal Bank used its power as nominal beneficiary to substitute Alaska Trustee for Pacific Northwest Title as the trustee for the Espelands' Deed of Trust. When Alaska Trustee recorded both documents on May 6, 2009, it recorded the assignment of the Deed of Trust from MERS to IndyMac Federal Bank before it recorded the Substitution of Trustee. Alaska Trustee recorded a Notice of Default the same day. In addition, OneWest Bank had a power of attorney granted by Deutsche Bank to facilitate the foreclosure sale.

The foreclosure was postponed three times, but the Espelands were unable to cure their default. On October 13, 2009, one day before the foreclosure sale, the Espelands sought a preliminary injunction barring the sale, which was denied by the superior court. At the sale on October 14, OneWest Bank was the sole bidder and purchased the property for $647,010.68. At the time of the foreclosure, Deutsche Bank held the Promissory Note and the beneficial interest under the Deed of Trust, IndyMac Federal Bank held the nominal beneficial interest under the Deed of Trust, OneWest Bank was the servicing agent for Deutsche Bank, and Alaska Trustee was the trustee under the Deed of Trust.

**D.    The Superior Court Proceedings**

**1.    Summary judgment**

The Espelands filed their first amended complaint on June 9, 2010, which, in relevant part, alleged that defects in the chain of title invalidated the foreclosure and that OneWest Bank violated RESPA by not responding to the Espelands' Qualified Written Request. Both sides moved for summary judgment. Before oral argument, the Espelands filed a late expert-witness declaration from Neil Garfield. The court declined to consider Garfield's statement because it was unsworn.

The superior court denied the Espelands' motion for summary judgment and granted summary judgment to OneWest Bank. It found no defects in the chain of title that would prevent Alaska Trustee from foreclosing. The superior court declined to address the Espelands' RESPA claim because the Espelands had failed to exhaust the required administrative claims process, and thus the superior court did not have jurisdiction to consider the claim. The superior court issued a judgment on May 8, 2012. The Espelands filed an appeal from that judgment, contesting the grant of summary judgment and the court's refusal to consider the declaration from Neil Garfield.

## 2. Motion for relief from judgment

The Espelands also filed a Motion for Relief from Judgment or Order in the superior court under Alaska Civil Rule 60(b). They primarily sought relief under Rule 60(b)(3) on the grounds that OneWest Bank, Alaska Trustee, and IndyMac Federal Bank were "collectively engaging in fraudulent misrepresentation, alteration and/or the production of forged documents to make a claim of ownership." They alleged that 45 pages of log notes produced in discovery[13] were correspondence between the parties and were "evidence of drafting and altering documents in an attempt to deceive the Plaintiffs and the Court."

The superior court denied the Espelands' motion for relief from judgment. The court ruled that although the Espelands' allegations "if proven would constitute fraud," the evidence they presented "does not meet the clear and convincing standard." The court noted that many of their fraud claims were substantially similar to the fraud

---

[13] OneWest Bank produced the log notes to the Espelands during discovery in October 2010. The log notes are a collection of records memorializing the performance of routine actions (such as updating a document or collecting a payment), notifications about the status of the foreclosure, requests for actions to be taken, and snippets of correspondence.

claims already ruled on and rejected in their motion for summary judgment, and to overcome that ruling the Espelands would have had to introduce new evidence, which they did not. The Espelands filed a second appeal, arguing that "the trial court in this case failed to give proper consideration to the entire record of the proceedings before it in conjunction with the specific evidence of fraud contained in the redacted documents submitted by the Appellees."

We consolidated the Espelands' two appeals for decision. In both appeals the Espelands are proceeding pro se.

## III. STANDARD OF REVIEW

We review the "grant of a summary judgment motion de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[14] In this examination, we draw all reasonable inferences in favor of the nonmovant.[15] In order to survive a motion for summary judgment, the party opposing summary judgment must present more than "unsupported assumptions and speculation."[16] The party "must set forth specific facts showing that there is a genuine issue of material fact."[17] And, this court may affirm on any ground in the record, not only those argued by the parties.[18] We "apply our independent judgment to questions

---

[14] *Erkins v. Alaska Trustee*, 265 P.3d 292, 296 (Alaska 2011) (internal quotation marks omitted).

[15] *Id*.

[16] *Boyko v. Anchorage Sch. Dist.*, 268 P.3d 1097, 1103 (Alaska 2012) (quoting *Perkins v. Doyon Universal Servs., LLC*, 151 P.3d 413, 416 (Alaska 2006)).

[17] *Kelly v. Mun. of Anchorage*, 270 P.3d 801, 803 (Alaska 2012).

[18] *Kuretich v. Alaska Trustee, LLC*, 287 P.3d 87, 88 (Alaska 2012).

of law, adopting the rule of law most persuasive in light of precedent, reason, and policy."[19]

We review the denial of a Rule 60(b)(3) motion for abuse of discretion.[20] We also review a trial court's decision to admit or exclude evidence for abuse of discretion.[21] An abuse of discretion exists only if we are "left with a definite and firm conviction on the whole record that the trial judge has made a mistake."[22]

## IV.   DISCUSSION

The Espelands are challenging three of the superior court's rulings. First, they argue that the court erred when it declined to admit the declaration of their expert, Neil Garfield. Second, they argue that the court erred when it granted summary judgment to the defendants. They contend that chain of title defects, RESPA violations, and an inadequate sale price create genuine issues of material fact. Third, the Espelands contend that the court erroneously denied their motion for relief from judgment under Rule 60(b)(3) and did not give full consideration to the evidence before it.

### A.   The Superior Court Did Not Abuse Its Discretion When It Declined To Consider Neil Garfield's Declaration.

The Espelands filed a late motion to admit the declaration of a new expert witness 11 days before oral argument on the cross-motions for summary judgment. Garfield professed to be an expert on the mortgage crisis and lending law, and his declaration discussed alleged defects in the chain of title for the Espelands' loan

---

[19]   *Shaffer v. Bellows*, 260 P.3d 1064, 1068 (Alaska 2011).

[20]   *Vezey v. Green*, 171 P.3d 1125, 1128 (Alaska 2007).

[21]   *Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 324 (Alaska 2012).

[22]   *Alaskan Adventure Tours, Inc. v. City & Borough of Yakutat*, 307 P.3d 955, 959-60 (Alaska 2013) (internal quotation marks omitted).

documents. The court declined to consider the declaration, in part because it found the declaration both sworn and unsworn.[23] Further, the superior court found the declaration "untimely and unjustified." The court noted that the Espelands submitted Garfield's declaration well past the deadline for expert submissions and without adequate excuse, even though they had retained Garfield over two months prior. The court also found that Garfield's declaration was incomplete because it referred to "included documents" that were not submitted with the declaration.

The Espelands argue that the superior court refused to consider Garfield's declaration "primarily because it disagreed with some of his conclusions, regardless of his expertise in the specific field of law underlying this suit." Although the court arguably found some of Garfield's conclusions not credible, which on summary judgment would be improper,[24] because the superior court alternatively provided several legitimate reasons for rejecting Garfield's declaration — the declaration's untimeliness incompleteness, and unreliability — we conclude that the court did not abuse its discretion in refusing to consider the declaration.[25]

---

[23]  The declaration was originally submitted to the court unnotarized, and later when it was notarized the first sentence of the notarized version still read, "My name is Neil Franklin Garfield, and this Declaration is made unsworn under the penalty of perjury."

[24]  *Yost v. State, Div. Of Corps., Bus. & Prof'l Licensing*, 234 P.3d 1264, 1276 (Alaska 2010) ("Credibility is a factual issue . . . properly determined by the factfinder at trial, not a matter of law determined by the court in summary judgment."); *see also Meyer v. State, Dep't of Revenue, Child Support Enforcement Div. ex rel. N.G.T.*, 994 P.2d 365, 367 (Alaska 1999) ("The court does not weigh the evidence or witness credibility on summary judgment.").

[25]  We need not decide whether the declaration was sworn or unsworn. We have noted, however, that "Rule 56(c) emphasizes the importance of affidavits, as
(continued...)

**B.      The Superior Court Properly Granted Summary Judgment For The Defendants.**

The Espelands' main contention is that defects in the chain of title of their loan documents invalidated the foreclosure.  Secondarily, they argue that OneWest Bank violated RESPA by failing to respond to their Qualified Written Request, and that the foreclosure sale of the property did not meet legal requirements. In order to raise a genuine issue of material fact, the Espelands were required to show specific, admissible facts, not mere speculation.[26]  They failed to do this.

**1.      There are no genuine issues of material fact regarding the chain of title and authority to foreclose.**

The Espelands argue that OneWest Bank and Alaska Trustee did not have authority[27] to foreclose.  They point to alleged defects in the notarization of the Deed of Trust, the transfers from E-Loan to IndyMac Bank and then to OneWest Bank, the Substitution of Trustee, and the assignment of the Deed of Trust from MERS to IndyMac Federal Bank.  However, the Espelands failed to produce any facts supporting these allegations.  A close examination of the loan's chain of title reveals that OneWest Bank had authority to initiate the foreclosure, and Alaska Trustee had authority to process the foreclosure.

---

[25](...continued)
opposed to unsworn allegations, with regard to summary judgment." *Bennett v. Weimer*, 975 P.2d 691, 694 (Alaska 1999).

[26]      *Boyko v. Anchorage Sch. Dist.*, 268 P.3d 1097, 1103 (Alaska 2012) (quoting *Perkins v. Doyon Universal Servs., LLC*, 151 P.3d 413, 416 (Alaska 2006)); *Kelly v. Mun. of Anchorage*, 270 P.3d 801, 803 (Alaska 2012).

[27]      The Espelands consistently use the word "standing," but as standing relates only to judicial foreclosures, we will assume they mean "authority" to conduct the non-judicial foreclosure.

### a.   The loan origination

The Espelands signed a Promissory Note creating the obligation to repay their loan and a Deed of Trust giving the lender, through the trustee,  the right to sell the property if they failed to repay the loan.  The Espelands argue that (1) the Deed of Trust was deficient because it was notarized on a different day than its internal reference date,[28] and (2) the Promissory Note was defective because "there was a genuine issue of fact as to the identity of the original lender identified by the Appellees as 'E-Loan.' "  The Espelands also question the transfer between E-Loan and IndyMac Bank.

The Espelands' first argument stems from that fact that the Deed of Trust refers to itself as "this document, which is dated September 15, 2005," when in fact it was not notarized until September 19, 2005.  The Espelands claim this discrepancy shows that the notary was not present when the document was signed, and hence there was notary fraud in the origination of the loan.  This argument is unavailing.  As the superior court correctly concluded, "Alaska's notary law does not prohibit a person from signing a document which refers to itself by a date other than the date the person actually signed."  A notary may notarize a document signed on a different day so long as the signer appears before the notary and acknowledges the signature.[29]  Moreover, the Deed of Trust was signed on September 19, the date that the document was notarized, so there is no reason to believe that the notary was not present.

---

[28]    On appeal, the Espelands argue very generally that there were defects in the chain of title.   While the Espelands did not precisely articulate their notarization argument on appeal, it was a central issue in the superior court. Because the Espelands are now proceeding pro se (they were represented by counsel in the superior court), we construe their general arguments to include the specific arguments presented to the superior court and address this issue.

[29]    AS 44.50.062(5).

Next, the Espelands argue that the there was a genuine issue of material fact regarding the identity of the lender. The Espelands contend that "OneWest and Deutsche Bank are far more connected than is being admitted and that they are, in fact, merely instrumentalities of an entity that has yet to be revealed and which also included IndyMac Federal, the prior holder of the Deed of Trust." This argument also fails to raise a genuine issue of material fact. Alaska law does not require that the lender be revealed in order for the transfer to be valid.[30] Thus, the "identity" of E-Loan does not have any legal bearing on whether the loan it initiated was a legitimate loan.

Finally, the Espelands question the transfer of the Promissory Note and Deed of Trust from E-Loan to IndyMac Bank. But there is no genuine issue of material fact regarding the occurrence of this transaction. E-Loan endorsed the Promissory Note in blank and gave it to IndyMac Bank.[31] IndyMac Bank later added its name to the endorsement, as permitted under AS 45.03.205(c).[32] In addition to IndyMac Bank's special endorsement, evidence of the sale can be found in MERS's records. Also, OneWest Bank employee Charles Boyle reviewed OneWest Bank's records of the loan

---

[30] The Espelands do not cite to any law that would require such a disclosure. Conveyances of land, mortgages, and deeds of trust are dealt with extensively under AS 34.20.010-.160, and nowhere in these statutes is there such a disclosure requirement.

[31] The Espelands cite a Massachusetts case for the proposition that blank endorsements are invalid, *US Bank Nat'l Ass'n v. Ibanez*, 941 N.E.2d 40, 53 (Mass. 2011) (holding blank transfers of real property are impermissible under Massachusetts law), but this case is inapposite as Alaska permits in-blank endorsements under AS 45.03.205(b).

[32] AS 45.03.205(c) provides that "[t]he holder may convert a blank endorsement that consists only of a signature into a special endorsement by writing, above the signature of the endorser, words identifying the person to whom the instrument is made payable."

and attested in an affidavit that the records reflect the transfer. In contrast, the Espelands failed to present any facts in support of their contention that this transfer did not occur.

### b. The loan securitization

In November 2005 IndyMac Bank and Deutsche Bank securitized the loan through a pooling and servicing agreement. The Espelands argue that the securitization gives "rise to a number of genuine issues of material fact that preclude summary judgment." Mainly, they argue that "there was insufficient evidence presented to the trial court that Deutsche [Bank] was the legal owner and holder of the note and Deed of Trust." They also contend that there is a genuine issue of material fact whether "the asset pool receive[d] the loan in accordance with the [Pooling and Servicing Agreement] terms, transferring physically from the Originator to the Sponsor to the Depositor to the Trust, with all intervening endorsements to the Custodian."[33]

There is ample, undisputed evidence that the transfer of the Promissory Note from IndyMac Bank to Deutsche Bank occurred. MERS's records show the transfer. Charles Boyle stated in his affidavit that IndyMac Bank physically transferred the Promissory Note to Deutsche Bank at this time. Ronaldo Reyes, an employee of Deutsche Bank, submitted an affidavit attesting to the existence of the agreement and Deutsche Bank's possession of the original Promissory Note. Deutsche Bank produced the Promissory Note, endorsed in blank, from its files and delivered it to OneWest Bank, which presented it to the court, accompanied by an affidavit from a OneWest Bank employee stating that he received the Promissory Note from Deutsche Bank and

---

[33] The second half of the Espelands' contention bears no resemblance to the laws regarding trusts and real property as laid out under AS 34.40.110: Alaska law does not require the physical transfer of the original loan instrument. Therefore, we will disregard this argument.

personally reviewed Deutsche Bank's records. The Espelands adduced no evidence to dispute these facts.

The Espelands' second argument, that Deutsche Bank did not "receive the loan in accordance with the [Pooling and Servicing Agreement] terms," is also unavailing. The Espelands do not provide any evidence that casts doubt on the validity of the transfer. Given the undisputed evidence discussed above, there is no reason to doubt that Deutsche Bank "receive[d] the loan in accordance with the [Pooling and Servicing Agreement] terms."

### c. The transfer of servicing rights to OneWest Bank

The Espelands argue that "there was no evidence offered that there was ever a proper assignment to OneWest [Bank]." However, the record reveals no genuine issue of material fact whether the transfer occurred. In March 2009 the FDIC sold all of IndyMac Federal Bank's assets to OneWest Bank.[34] When OneWest Bank acquired IndyMac Federal Bank's assets, it executed a Servicing Business Asset Purchase Agreement for IndyMac Federal Bank's contractual servicing rights. These contractual servicing rights included the servicing rights for the Espelands' loan. OneWest Bank provided the superior court with a copy of the Purchase Agreement and a copy of the notice it sent to the Espelands informing them that it was their new servicer. MERS recorded the transfer of servicing rights. In addition, OneWest Bank employees J.C. San Pedro and Charles Boyle attested to the transfer in affidavits. Thus, there was ample evidence that the servicing rights were assigned to OneWest Bank, making it the servicing agent for Deutsche Bank.

---

[34] *See Failed Bank Information: Information for IndyMac, F.S.B. and IndyMac Federal Bank, F.S.B., Pasadena, CA*, FEDERAL DEPOSIT INSURANCE CORP., http://www.fdic.gov/bank/individual/failed/IndyMac.html. (last updated Nov. 20, 2013).

### d. The non-judicial foreclosure

In December 2008 the Espelands ceased repaying their loan. The following April OneWest Bank requested that Alaska Trustee initiate a non-judicial foreclosure under IndyMac Federal Bank's name. As is routine, Alaska Trustee sought title insurance for the foreclosure. Because the Deed of Trust's holder of record was still MERS, First American Title would not insure the foreclosure until the holder of record matched the name in which the foreclosure was ordered — IndyMac Federal Bank. The Servicing Business Asset Purchase Agreement executed between IndyMac Federal Bank and OneWest Bank contractually obligated IndyMac Federal Bank to help OneWest Bank foreclose. MERS assigned the Deed of Trust to IndyMac Federal Bank on April 22, 2009, thereby transferring its nominal beneficial interest.[35] IndyMac Federal Bank then used its power as nominal beneficiary to substitute Alaska Trustee as the trustee under the Espelands' Deed of Trust.

The Espelands contend that there are three genuine issues of material fact: (1) whether MERS had the power to transfer the nominal beneficial interest to IndyMac Federal Bank; (2) whether the substitution of trustee under the Deed of Trust was operative;[36] and (3) whether OneWest Bank had authority to foreclose if the foreclosure was ordered in IndyMac Federal Bank's name.

---

[35] The actual beneficial interest — the ultimate ownership rights — remained with Deutsche Bank. The assignment of the Deed of Trust to IndyMac Federal Bank simply made IndyMac Federal Bank the new owner of record in order to give it clear title in the public record.

[36] Again, the Espelands do not specifically make this argument on appeal; instead they generally argue there were defects in the transfer. The issue was central and argued at length in the superior court when the Espelands were represented by counsel. We again give them the benefit of their pro se status and address this issue as if it had been more fully argued on appeal.

First, the Espelands argue that "[b]ecause MERS was never the lawful holder or assignee of the note, the assignment of the mortgage to Indymac is a nullity, and MERS was without authority to assign the power to foreclose to Indymac." But the Espelands' Deed of Trust granted MERS, as nominal holder of the beneficial interest, the right to "take any action of [the] Lender" including "the right to foreclose and sell the Property." As nominee, MERS had the authority to take any action that the actual beneficiary could have taken, including transferring its nominal beneficial interest to another party. The Espelands have cited no Alaska authority to the contrary. MERS had the power to assign the Deed of Trust and thereby transfer its nominal beneficial interest to IndyMac Federal Bank.

Second, the Espelands argue that IndyMac Federal Bank's substitution of Alaska Trustee for Pacific Northwest Title under the Deed of Trust was invalid because it was executed on April 21, 2009, one day before IndyMac Federal Bank received the nominal beneficial interest from MERS. In their view, IndyMac Federal Bank attempted to execute the substitution before it had the power to do so. This argument also fails. A new trustee succeeds to the powers of the old trustee at "the time the substitution is filed for record."[37] Therefore, the proper inquiry is into the relationship of the parties at the moment the substitution is recorded, not the moment that it is executed. The superior court found that on the day the two documents were recorded, May 6, 2009, the assignment of the Deed of Trust from MERS to IndyMac Federal Bank was recorded one minute before IndyMac Federal Bank's Substitution of Trustee. Thus, at the time that the Substitution of Trustee was recorded, IndyMac Federal Bank had the power to substitute the trustee.

_____

[37]    AS 34.20.120(c).

Finally, the Espelands contend that OneWest Bank and Alaska Trustee still did not have the authority to foreclose. They argue, among other things, that because the foreclosure was ordered in IndyMac Federal Bank's name, OneWest Bank was without authority. But as the superior court correctly found, the "question of 'why' the foreclosure was initiated in the name of IMFB [IndyMac Federal Bank] is not relevant to this Court's determination of the legality of the transaction." The two parties that actually needed authority to participate in the foreclosure — OneWest Bank and Alaska Trustee — had authority. Thus it is irrelevant which nominal beneficiary was ordered to foreclose on the Deed of Trust.[38]

Alaska Statute 45.03.301 provides that "[a] person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument." Despite not being the "owner" of the Promissory Note, both OneWest Bank and Alaska Trustee were entitled to enforce the Deed of Trust: OneWest Bank as Master Servicer for Deutsche Bank, and Alaska Trustee as the trustee under the Deed of Trust appointed by the nominal beneficiary, IndyMac Federal Bank.

As detailed earlier, there were no defects in OneWest Bank's assumption of the servicing rights. The Pooling and Servicing Agreement between Deutsche Bank and IndyMac Bank defines the "Master Servicer" as "IndyMac Bank . . . and its

---

[38] Additionally, as the nominal beneficiary, IndyMac Federal Bank itself had the power to foreclose. Most federal courts and state courts that have considered the issue have found that the nominee has the power to foreclose. *See, e.g.*, *Trent v. Mortg. Elec. Registration Sys., Inc.*, 288 Fed. App'x. 571 (11th Cir. 2008); *Morgera v. Countrywide Home Loans, Inc.*, No. 2:09CV01476-MCE-GGH, 2010 WL 160348, at *8 (E.D. Cal. Jan. 11, 2010); *In re Huggins,* 357 B.R. 180 (Bankr. D. Mass. 2006); *Mortg. Elec. Registration Sys., Inc. v. Revoredo,* 955 So. 2d 33 (Fla. App. Mar. 14, 2007); *In re Sina*, No. A06-200, 2006 WL 2729544 (Minn. App. Sept. 26, 2006); *Mortg. Elec. Registration Sys., Inc. v. Ventura*, No. CV 054003168S, 2006 WL 1230265 (Conn. Super. Apr. 20, 2006).

successors and assigns." The purchase of IndyMac Federal Bank's assets made OneWest Bank the "successor" of IndyMac Federal Bank. Further, the Purchase Agreement between IndyMac Federal Bank and OneWest Bank provided that OneWest Bank would have "all Servicing Rights accruing to [IndyMac Federal Bank] under the Servicing Agreements including all rights to . . . take other rightful actions in respect of breaches [and] defaults." The Pooling and Servicing Agreement not only authorized the "Master Servicer" to foreclose, it required it to foreclose.[39] The Espelands have presented no evidence tending to refute these facts.

As the trustee under the Espelands' Deed of Trust, Alaska Trustee had authority to conduct the foreclosure. In the Deed of Trust, the Espelands granted the trustee a "power of sale" for the property. In the event of a default, the "trustee shall sell the property at public auction." This right was originally granted to Pacific Northwest Title and then transferred to Alaska Trustee by IndyMac Federal Bank in the Substitution of Trustee recorded May 6, 2009. Once Alaska Trustee received its appointment on May 6, it was empowered to proceed with the non-judicial deed of trust foreclosure in accordance with the Deed of Trust's "power of sale" provision.

In addition, the Espelands challenge the fact that the original Promissory Note was not present at the foreclosure. However, AS 34.20.070 and AS 34.20.080 provide the requirements for a sale by a trustee, and they do not require the loan instrument be present at the sale.

After carefully examining the transfers of rights and interests surrounding the Espelands' loan, we conclude that there were no defects in the chain of title giving

---

[39] The Agreement states that "[t]he Master Servicer shall use reasonable efforts in accordance with the Servicing Standard to foreclose on or otherwise comparably convert the ownership of assets securing such of the Mortgage Loans as come into and continue in default."

rise to genuine issues of material fact. OneWest Bank had authority to initiate the foreclosure as Master Servicer for Deutsche Bank, and Alaska Trustee had authority to perform the foreclosure by virtue of its role as trustee under the Deed of Trust. Thus, both entities acted within their authority during the foreclosure process.

**2.    The superior court properly declined to consider the Espelands' RESPA claim.**

The Espelands argued in the superior court that OneWest Bank violated RESPA when it did not answer their Qualified Written Request in full, but the superior court declined to address this claim because the Espelands failed to exhaust their administrative remedies. The superior court was correct because IndyMac Bank was in FDIC receivership when the Espelands made their Qualified Written Request.[40] The federal appellate courts that have considered the issue have uniformly held that debtors' RESPA actions are subject to administrative exhaustion if the bank is in FDIC receivership.[41] Thus, the Espelands were required to exhaust their administrative remedies before the superior court could have jurisdiction over the RESPA claim.

**3.    The Espelands' arguments regarding the sale of the property are waived.**

The Espelands argue that the sale price at the foreclosure was inadequate and that Alaska Trustee misled them into thinking the sale would be stayed pending the outcome of their case. The Espelands never raised their inadequate-sale-price argument in the superior court. And, after they filed their First Amended Complaint, the Espelands abandoned their argument that Alaska Trustee misled them into thinking the sale of their

---

[40]    *Failed Bank Information: Information for IndyMac, F.S.B., and IndyMac Federal Bank, F.S.B., Pasadena, CA*, FEDERAL DEPOSIT INSURANCE CORP., http://www.fdic.gov/bank/individual/failed/IndyMac.html (last updated Nov. 20, 2013).

[41]    *See, e.g.*, *McCarthy v. F.D.I.C.*, 348 F.3d 1075, 1079-80 (9th Cir. 2003) (noting uniformity of circuits).

home would be postponed. These arguments are waived because, as we have repeatedly held, "a party may not raise an issue for the first time on appeal."[42]

## C. The Superior Court Did Not Abuse Its Discretion When It Denied The Espelands' Motion For Rule 60(b)(3) Relief.

The Espelands' second appeal stems from their motion to the superior court for Alaska Civil Rule 60(b)(3) relief from judgment or order. Under Rule 60(b)(3), a litigant can receive relief from a court order or judgment by showing "fraud, . . . misrepresentation, or other misconduct of an adverse party"[43] by clear and convincing evidence.[44] The fraud must have "prevented the losing party from fully and fairly presenting his case or defense."[45] The superior court found that the Espelands failed to present clear and convincing evidence of fraud, and denied their motion for relief.

The Espelands argue that: (1) the log notes show fraud by clear and convincing evidence; (2) the court failed to consider the use of "notorious robo-signers"; and (3) the court failed to consider their arguments as a whole. After examining the record, including the disputed log notes, we conclude that the superior court did not abuse its discretion — nothing presented by the Espelands raises an inference of fraud, much less clear and convincing evidence of fraud.

---

[42] *Hymes v. DeRamus*, 222 P.3d 874, 889 (Alaska 2010) (quoting *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001)).

[43] *Babinec v. Yabuki*, 799 P.2d 1325, 1328 n.3 (Alaska 1990).

[44] *Id*. at 1333.

[45] *McCall v. Coats*, 777 P.2d 655, 658 (Alaska 1989) (quoting *Rozier v. Ford Motor Co.*, 583 F.2d 1332, 1339 (5th Cir. 1978)).

**1.    The log notes do not show fraud by clear and convincing evidence.**

The Espelands claim that the log notes contain evidence of fraudulent alteration of numerous documents including the Notice of Default, the 2009 Substitution of Trustee, the 2009 Assignment of the Deed of Trust, the Trustee's Deed, an unspecified Affidavit of Mailing, the payment history, and the foreclosure sale postponement letters. However, the Espelands do not state where exactly in the 45 pages of log notes they believe the evidence of fraud is located.[46] On close reading, the log notes do not suggest any fraud in any of the documents; indeed, the log notes appear to support the documents.[47]

Next, the Espelands argue that there are discrepancies between the log notes and the affidavits submitted by Alaska Trustee and OneWest Bank in support of their authority to foreclose. In their motion to the superior court, the Espelands quoted several log notes that contain requests for a copy of the Promissory Note showing the endorsement from E-Loan to IndyMac Bank. According to the Espelands, these quotes are "convincing proof of efforts to endorse the un-endorsed, un-delivered Promissory Note in 2009-2010." The Espelands allege these quotes contradict affidavits of employees at OneWest Bank and Deutsche Bank that the Promissory Note was "endorsed and delivered to the Trust, during the 11-1-2005 to 11-30-2005 Pooling and Servicing Agreement window."

---

[46]    The Espelands only cite to the notes in their entirety. In their motion to the superior court they provided a list of quotes from the log notes without explaining what they believe is incriminating about each quote.

[47]    The log notes record that on April 20, 2009, an anonymous user sent a message stating "attached is the [Substitution of Trustee], please properly execute and return to our office. Thanks." This date coincides with the execution date on the Substitution of Trustee.

The log notes clearly state that the copy of the Promissory Note that OneWest Bank had in its database did not show an endorsement to IndyMac Bank. However, the fact that the copy in OneWest Bank's database was not endorsed does not mean that the actual Promissory Note itself was not endorsed. Nor do the log notes contradict the affidavits' claim that the Promissory Note was in Deutsche Bank's possession. As the superior court found, the log notes reveal that OneWest Bank persistently and repeatedly asked for a copy of the original Promissory Note showing the endorsement for about a year without success. The superior court declined "to interpret the insistent nature of the communication as evidence of collusion to produce fraudulent records." We agree that the log notes may provide evidence of procrastination, but not of fraud. We also conclude that nothing in the log notes contradicts any of the affidavits or indicates that the Promissory Note was transferred incorrectly.[48]

2.      **The Espelands did not present admissible, relevant evidence that any of the documents involved in their loan were "robo-signed."**

The Espelands also argue that the use of "notorious robo-signers"[49] supports

_____

[48]      Some of the log notes quoted by the Espelands reference "allonges," which are "slip[s] of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." BLACK'S LAW DICTIONARY 88 (9th ed. 2009). The Espelands argue that "[t]he existence of proper allonges to the chain of title is essential." But when the Promissory Note was produced, all endorsements were present on the back of the Note, making any argument regarding allonges inapposite.

[49]      "Robo-signing" does not have an exact definition. It refers to various illegal practices used by some in the foreclosure industry to process foreclosure documents faster. Elizabeth Renuart, *Property Title Trouble In Non-Judicial Foreclosure States: The Ibanez Time Bomb?*, 4 WM. & MARY BUS. L. REV. 111, 124-26 (2013). One New York court defined "robo-signer" as "a person who quickly signs hundreds or thousands of foreclosure documents in a month, despite swearing that he or she has personally

(continued...)

a finding of fraud. They level specific allegations against Erica Johnson Seck, who signed the June 2010 Assignment of Deed of Trust, and Eric Tate, who signed the 2009 Substitution of Trustee. But the Espelands provided no evidence supporting their accusations that Tate is a "robo-signer," and although the Espelands provided more support for Seck, the document signed by Seck — the Assignment of the Deed of Trust in 2010 — was unnecessary for the foreclosure.[50]

As further evidence that some documents were "robo-signed," the Espelands allege that certain documents were executed in different states than where they were notarized. They contend that the documents "imply same-day execution and notarization, by signers of Indymac and MERS in California and Virginia, and notaries in Texas and Minnesota." While the documents in question state that they were notarized in Texas and Minnesota, they do not indicate where they were executed and none contains any reference to California or Virginia. Thus, there is no merit to the Espelands' claim that the involvement of alleged "robo-signers" and different states of execution prove fraud by clear and convincing evidence.

### 3. The superior court did not fail "to give proper consideration to" the Espelands' evidence.

The Espelands argue that in denying their motion for Rule 60(b)(3) relief, the superior court "failed to give proper consideration to the entire record of the proceedings before it in conjunction with the specific evidence of fraud contained in the redacted documents." This argument is likely in response to the superior court's

---

[49](...continued) reviewed the mortgage documents and has not done so." *OneWest Bank, F.S.B. v. Drayton*, 910 N.Y.S.2d 857, 859 (N.Y. Sup. Ct. 2010).

[50] This assignment was executed six months after the foreclosure occurred and was not the basis for any of the parties' authority to foreclose.

statement that "[a]dditionally, the [p]laintiffs' claims of fraud and misrepresentation are substantively similar to claims made in the [p]laintiffs' original Motion to Void Non-judicial Foreclosure and rely on the same evidence." The court then noted that it had "already ruled that such claims lack merit."

To prevail on a Rule 60(b)(3) motion, the Espelands need not prove that they would have prevailed but for the fraud or misconduct.[51] Nonetheless, "a litigant is not prevented from fully and fairly presenting his or her case where misconduct 'had little bearing on the merits of the case.' "[52] Here, the Espelands argued many of the same fraud claims in their Rule 60(b)(3) motion that they raised in their summary judgment proceedings, but they did not present any new evidence with respect to those claims. Therefore, their allegations have little bearing on the merits of the case — the superior court had already found them meritless based on the same evidence (or lack of evidence) presented during the summary judgment proceedings. The burden rested on the Espelands to prove fraud by clear and convincing evidence, but instead they rehashed the arguments made and rejected previously. Consequently, the superior court did not abuse its discretion when it denied the Espelands' Rule 60(b)(3) motion — a Rule 60(b)(3) motion is not the appropriate forum to revisit arguments already made and found to be without merit.

## VI. CONCLUSION

We AFFIRM the superior court's grant of summary judgment against the Espelands and its denial of their motion for Rule 60(b) relief.

---

[51] *Alaskan Adventure Tours, Inc. v. Yakutat*, 307 P.3d 955, 961 (Alaska 2013).

[52] *Id.* (quoting *McCall v. Coats*, 777 P.2d 655, 658 (Alaska 1989)).